on behalf of the appellant Alvin Redmond, I'd like to reserve three minutes for rebuttal. On April 7, 2017, Alvin Redmond was admitted to University of Iowa Hospitals and Clinic with an infected diabetic ulcer on his right pinky toe. Doctors did an MRI and found that only the pinky toe was infected at the time and that the infection had not reached the bone. Defendant Michael Wiley examined Mr. Redmond and noted that the infection would act as a contiguous infection unless the toe was amputated. Dr. Wiley also noted that Mr. Redmond was medically cleared for surgery that very day and that Mr. Redmond agreed to the surgery. Yet Dr. Wiley decided not to conduct the surgery and instead returned Mr. Redmond to Iowa Department of Corrections Care, deciding that the toe amputation would occur at a later unknown date on an outpatient basis. At IMCC, defendant Joel Kosinski saw Mr. Redmond six times over the month of April and each time he noted that Mr. Redmond's condition was worsening. His toe was getting blacker, the smell was getting more foul, and the dead flesh was expanding. Therefore, twice on April 18 and April 20, Dr. Kosinski's notes reflect that he was going to expedite Mr. Redmond's amputation, but he never did. Counsel, this is Judge Kobus. Isn't there some indication on the record that your client had additional health problems that prevented an immediate surgery, or am I thinking of something that doesn't exist? So, Your Honor, I know the record is complicated and the briefing is a little confusing, so I would love to clarify that for you. So, on April 8th, when Mr. Redmond was first admitted to the hospital, there was nothing preventing the amputation. So, Your Honor, the kidney condition is what prevented the actual leg amputation after they had already performed the toe amputation. But by then, the damage had been done. By the time the kidney condition had stopped the leg amputation, the infection had already spread. Well, how do we know that a reasonable doctor would have done the surgery immediately when there's no medical testimony in the record establishing that? Well, Your Honor— It seems to me that the most you've shown is some level of malpractice, and that's certainly not sufficient under our case law. Well, Your Honor, I think there are two answers to your questions. On April 18th and April 20th, Dr. Kosinski's own notes reflect the need to expedite the surgery. He said twice in his notes that the surgery needed to be expedited based on Mr. Redmond's condition. And under this court's case law, if a medical condition is so obvious, there's no need for the verifying medical evidence. And I think it's clear that when a toe goes from simply having a blister on it to the point where it's falling off, and doctors saw Mr. Redmond repeatedly during that time frame, it would have been apparent to a layperson that some kind of intervention was necessary. And what I think is also important to note on this record is that defendants never scheduled this amputation. The only reason the amputation occurred was because Mr. Redmond ended up in the emergency room with a hundred-plus degree fever and his toe hanging onto his foot by his skin. So I think this is just like this court's cases in Moore, in Schaub, in Roberson, and Hartsfield, where this court said, look, based on what the defendants could see, something needed to be done here. And defendants just ignored it. They ignored an acute and escalating situation. Well, you keep talking in the, you know, across the board, defendants for the whole period. You've got to focus on what defendant, remember qualified immunity is personal to defendants. You have to focus on a specific delay by a specific defendant and explain what causation defeats qualified immunity for that particular delay. I must say Nurse Hacker's initial treatment doesn't begin to seem to have evident causal connection to the ultimate tragedy. This is Judge Gross. In that regard, could you start with Dr. Kuczynski? That's who I'm most interested to address all of the three defendants in the brief. So for Dr. Kuczynski, I think his deliberate indifference in this case is really the fact that he ignored, in this court's language, an acute and escalating situation. Namely, after Mr. Redman was discharged from the hospital on April 10th, Dr. Kuczynski saw him six times over the course of April. Each time Dr. Kuczynski saw him, he noted that his toe was getting worse and noted that he needed to expedite the amputation. Yet nothing in the record reflects that he actually took steps to expedite the amputation. And then starting in May 1st, Dr. Kuczynski just stopped seeing Mr. Redman at all. And he went three weeks without personally examining Mr. Redman, despite being on high alert of Mr. Redman's condition. And it took Mr. Redman literally threatening to go on a hunger strike before Dr. Kuczynski saw him again. And by that point, Mr. Redman ended up in the emergency room three days later. And that's when the toe amputation had to be scheduled because it was an emergency situation. So I think that is Dr. Kuczynski's deliberate indifference in this case. It's really his failing... Now wait a minute. Counsel, Dr. Kuczynski was not at the Iowa hospital clinics, was he? Wasn't he at the medical center? Yes, Your Honor. Okay. On May 1, my notes say that Mr. Redman returned to the hospital. Yes. What does Dr. Kuczynski have to do now? Step in and tell Iowa clinics how to do their job? I mean, I think, Your Honor, at the point where Dr. Kuczynski notes the need to expedite an amputation, he needs to take in his medical... And presumably that was his medical judgment, that the amputation needed to be expedited. Presumably he would have to take some step to expedite... Why? He's not a surgeon. He knows that Redman goes back to the hospital where surgery will be performed. How in the world is he anything other than... Is it some kind of negligent omission and following up? I can't see where this gets anywhere near deliberate indifference. Your Honor, I think this is the exact same thing that this court addressed in Roberson, where they discussed the jailer's kind of day-to-day oversight of a... That's jailer's... Counsel, this is medical professionals. In our cases, our cases make it clear that the analysis differs as between the two. Well, and I think actually, Your Honor, in this case, that's why Dr. Kuczynski is more liable, because he recognized the need to expedite it, and he didn't. And your authority... Your Honor, Mr. Redman was not under his supervision or control. But, Your Honor, I think at a minimum, Dr. Kuczynski, if he noted the need to expedite, it could have sent Mr. Redman back to the hospital, but he didn't even do that. So I don't think... And I think this is one of the major problems in this case, that the defendants kind of point the finger at each other when literally Mr. Redman's toe, the infection was eating it away. It was literally deteriorating, in Dr. Kuczynski's words, before his eyes. And I think in that point, a prison doctor just can't say, well, I can't do it, so I don't have any obligation to kind of try to seek further care. I think Dr. Kuczynski was under an obligation to do something to expedite Mr. Redman's treatment. In terms of Dr. Wiley's deliberate indifference, I think it's clear here that Dr. Wiley noted the need for an amputation as early as April 8th, and that's on the record. And Dr. Wiley noted why the amputation was necessary. Mr. Redman's toe was infected, but without that amputation, the infection would spread. Yet Dr. Wiley never attempted to schedule that amputation. And on this record, the only reason the amputation occurred, again, was because Mr. Redman ended up in the emergency room. And another critical aspect of Dr. Wiley's deliberate indifference is that his records repeatedly reflect that Mr. Redman needed a follow-up vascular before the amputation would occur. And Dr. Wiley being in charge of Mr. Redman's care at Iowa, there is no evidence in the record to show that he scheduled that follow-up. There's no evidence in the record to show that he escalated the vascular follow-up when it didn't occur. And so I think, again, that is clear deliberate indifference where the doctor didn't provide the care that Mr. Redman needed at the time that he needed it. In terms of Nurse Hacker, I think her clearest instance of deliberate indifference is her failure to provide the treatment that the Iowa hospital recognized that Mr. Redman needed. So Mr. Redman was prescribed a certain medicine. And what's the causation evidence there that that somehow caused the amputation or the delay? Your Honor, I think at this point, this court can infer, because it's summary judgment and all reasonable inferences must be drawn in Mr. Redman's favor, that when doctors provide a certain medication to treat an infection and that medication isn't provided and that infection spreads, that that lack of medication has some contributing effect to Mr. Redman's medical condition. Counsel, I thought the evidence was or one of the briefs said that the substitution of medications was ordered by a doctor at the present. Your Honor, I think... Nurse Hacker, she doesn't have the ability to overrule a doctor, does she? Your Honor, I think the evidence is a little less clear than that. I mean, I think the evidence shows that Nurse Hacker, Nurse Practitioner Hacker had a conversation with their doctor within the Iowa Department of Corrections medical system. It's unclear who recommended the medication change, but that doctor with Nurse Hacker's consultation approved giving Mr. Redman amoxicillin, which is a general antibiotic that most of us in this room have taken, or I guess in this virtual room have taken at some point, instead of the specialized antibiotic that the experts at the hospital recognized was needed to treat this infection. And so while I don't think the causation is necessarily, it's clear to see how you get from A to B, as this court said in Schaub, causation is a factual question. Unless it's clearly not the case that this had any effect, such that you can rule on causation as a matter of law, that's exactly the type of question that but I think in this case, you can draw the inferences in Mr. Redman's favor and assume that it has some kind of deleterious effect on Mr. Redman's condition. But the jury has to find deliberate indifference, not negligence. Yes, Your Honor. And I think under this court's case in King v. Busby, this court said that a withholding of medication claim is deliberate indifference and can go... This wasn't withholding. This was not withholding, despite all the attempts on your briefs to say it was. It was substitution of one antibiotic for another, directed by a doctor. Yes, but I think the jury could find that that substitution was just beyond the pale, that not providing a specialized medication that the experts recognized was needed, and instead providing some general antibiotic isn't just negligence, that is deliberate indifference. Well, how are the juries supposed to know whether one antibiotic, how much more effective it is than the other? I mean, that's quite a stretch, isn't it? I mean, Your Honor, I think these types of claims are difficult, and I am not obviously in a place to fully hypothesize about what kind of evidence could be presented at trial. But I do think there is... I do think it's within the juror's realm of decision-making capabilities to say that if a condition worsens and if a medication that was designed to treat that condition was not provided, that that had some kind of causation or some kind of effect on Mr. Redmond's condition. And of course, Mr. Redmond at trial could introduce expert testimony that could further elucidate the point. But I think at this point, it's reasonable to inference in Mr. Redmond's favor that that was harmful. Counsel, I've got a question regarding Mr. Redmond's brief. Yes, Your Honor. Could you tell me whether the images of Mr. Redmond that are contained in the brief are in the record? Your Honor, they're not in the record, but I believe this court can take judicial notice of those images. The reason I ask the question... It's my understanding that there are students involved in this brief. Yes, Your Honor. I think it's important that they know that they need to stick to the record on appeal, and they could find themselves subject to motions to strike or worse. Yes, Your Honor. And we did the research on the case law in terms of extra record materials and what the court could take judicial notice of. And we determined that in our legal opinion, that this court can take judicial notice of pictures that were in the defendant's own records and that are not capable of being disputed. And defendants do not dispute the accuracy of those images or the fact that this court can't take judicial notice of it. And I think why the images are important here is because, again, the words on the paper are evocative. I mean, you have doctors describing his toe as disintegrating and deteriorating. You have doctors describing the dead flesh as expanding. You have doctors describing his toe as putrid smelling. And so all of their words make it obvious. But if you look at it, it is clear that something should have been done sooner and that nobody attempted to do anything sooner. And I think that is exactly what deliberate indifference is. I think it's looking at a condition, knowing that something needs to be done, but then doing nothing. But the problem is we are reviewing a summary judgment on a summary judgment record. And you're telling us that the things that Mr. Redmond did not present to the district court, you can throw at us and get us to reverse the district court on the basis of that evidence. Your Honor, that's not what I'm saying. I don't care whether it's judicially noticeable or not. It's not in the summary judgment record. Your Honor, that's not what I'm saying at all. What I'm saying is all of the ammunition that this court needs to reverse the district court is in the defendant's own records. They describe the toe. The records aren't in the summary judgment record. You want a do-over in the appellate court of the putting together of a summary judgment record? That we do not allow. Your Honor, no. At this point, I'm talking about the hospital records that the defendants themselves submitted in the district court. And I know they're voluminous. But a look at those pictures. Wait, wait, wait, wait. There's a summary judgment record and there are defendant records. Judge Graz asked you whether this was in the summary judgment record and you said no. Now you say, well, it was in the defendant's records. I'm sorry, Your Honor. To be clear, all I was saying is that the two pictures in the brief were not in the summary judgment record. What I'm saying is all of the hospital records outside of the pictures that we cite to in our and clearly lay out the deliverance and difference in this case. They explained that the toe was worsening in the doctor's own words. They explained the dead flesh was expanding. They explained that the toe was hanging off of his foot by the end. And so they explained that the amputation, they knew it was needed in April, that it was never scheduled and it only occurred when Mr. Redmond ended up in the emergency room. All of that is in the defendant's own records. All of that was before the district court. And I think this court can disregard the pictures and it's still clear, just as it was clear more in Roberson and Hartsfield that the defendants ignored the situation. And if an infected tooth gets ignored for two months, and this court said that's enough to go to a jury, it's hard to see how a toe falling off of a foot is not obviously enough that some intervention should have been taken. And I see I'm over my time. And so if I may have a minute for a vote. Thank you. We'll see. Ms. Wallace. Yes, your honor. Thank you. Can you hear me? Yes. Thank you. Lorraine Wallace from the Iowa from the Iowa attorney general's office. I represent the five prison defendant appellees in this case. And I just want to first and foremost say that is clear. Let me stop you. When you talk about five, I thought there were only three at issue on the appeal. Regardless of how many started out in the case, I thought, do we have to consider anyone but a nurse hacker and Dr. Willie? That is what what my argument is right now. Dr. Kosinski and nurse practitioner hacker are my clients, as well as Warden Johnson from Fort Dodge prison, Warden McKinney from IMCC and Deputy Warden Ort from IMCC. So my five clients, those are my five clients. And it is my clearly by the briefing, Warden Johnson, Warden McKinney and Deputy Warden Ort, although they are the Mr. Redmond took an appeal from against them and they are, you know, the appellees in this case, there's no argument against them. And thus I'm asking the court to uphold the lower court's dismissal of them as it is uncontested by the arguments asserted by Mr. Redmond. Counsel, I'd like to follow up on a line of questioning that I think Judge Kobus started with the opposing counsel. And it seems to be maybe one of your strongest points, but yet it's something that I think is still in question. And that's this. Normally the plaintiff would need to submit a verified medical evidence to show that there was some harm caused by delay in treatment. But here, isn't it rather obvious even to a lay person that delay in treatment here would cause harm? Why would he need to introduce medical evidence of something that seems so obvious? Because there was no delay in treatment. And while it isn't obvious, it is not obvious when it is proper to do an amputation of a toe or of a leg. It is clear that there was no delay. Certainly... Counsel, aren't there records indicating that, I forget which physician it was, but that that this needed to be done quickly? I forget the exact language. But I mean, there are indications in the record that it needed to be done sooner rather than later. Am I wrong on that? Sure. There is evidence in the record that Dr. Kozinski did say in April that, and I think it was April 18th and maybe April 28th, that this should be expedited. And in fact, he was then to... Dr. Kozinski did get him expedited and sent back to UIHC May 1. On that particular visit then, the professionals there at the hospital put a cast, chose the course of treatment, which is proper under all the medical standards, and which Dr. Kozinski agreed with in this treatment plan. They put a cast on the foot to settle it down. And before the amputation was done, it was then when the cast was on that the renal problem, the creatine levels went so high. So there was no delay, and it is not obvious in the records that the amputation needed to go right away. Counsel, let me follow up on that. Counsel, this is Judge Grimes. Let me follow up on that a little bit. Dr. Kozinski's brief states on page 27 that there's no evidence that the may be some confusion between the amputation and other care. And I'd like to go into this in a little bit of depth with you. I think the record shows that on April 7th, a doctor noted that Redmond's toe needed to be amputated. Three days later, on April 10th, he was prescribed antibiotic. And it appears from the record that Dr. Kozinski was aware of this on that date, that he then examined Mr. Redmond on the 11th, but that he didn't order the prescribed antibiotic until April 18th. No, that is not. Is that not true? That is not correct. That is not true. You can see in the record of Dr. Kozinski's note of April 11th that he was put on Cipro. And that is in the record. It was in the summary judgment record. He was put on Cipro back at the prison. He was on it when he came from the hospital back to the prison on April 10. He continued on that Cipro for two weeks. And that is shown by Dr. Kozinski's April 11 note. It is also shown by Mr. Redmond's admission to the prison's defendant's statement of facts that when he returned to the prison on April 10, that Dr. Kozinski and the prison followed all the recommendations of care from UIHC. So what happened on the 18th with regard to his prescription? He was on the Cipro at that time and he continued to be on the Cipro for two weeks. He was on Cipro on April 18 and he continued. All right. Thank you. Which was the plan of care from UIHC. Your Honor, I'd like to end my time now, my argument. Counsel, no, I need to cover, go back to the treatment and put this in summary judgment terms. Your brief, relying heavily on our Beierbach case, says that plaintiff loses on a delay of treatment because there was no affirmative medical evidence. But in Beierbach, the defendants in moving for summary judgment put forth strong medical evidence that the delay was not detrimental. And the plaintiff, to use a common phrase, the plaintiff attempted to fight something with nothing. Here it appears that the plaintiff simply fought nothing with nothing. Or even more to the point, said, I don't need something affirmative at the summary judgment stage because their records, they don't have any affirmative evidence of delay not being detrimental and their records are evidence to the contrary. How do you respond to that? I respond to that by two things. Number one, the delay issue was never before the lower court. This is a new argument, new issue that they're asserting on appeal, which by the cases I cited, they cannot do. Second of all, it was clear on the summary judgment record that there in fact was no delay in care from nurse practitioner Hackert nor Dr. Kaczynski. I'd like to yield my time now to Mr. Pope. May it please the court. My name is Pope Yamada, counsel for Dr. Michael Wiley. Dr. Wiley is an a attending orthopedic surgeon at the University of Iowa Hospital and Clinics and professor of medicine at the University of Iowa College of Medicine. University of Iowa Hospital and Clinics is a state institution and a primary tertiary healthcare facility. It is Dr. Wiley's position that the district court did not err in granting summary judgment because there remains no genuine dispute of material fact to support apparel. Elvin Redmond's claim that Dr. Wiley was indifferent because he delayed the amputation of his necrotic fifth toe and that the medical record demonstrates that Redmond's toe required amputation. The fact that Redmond's necrotic fifth toe required amputation is not in dispute. And I think the court has focused on that as has appellant by the number of records indicating that amputation of the fourth toe of the fifth would be required. Dr. Wiley's own consult note and affidavit admits that Redmond's necrotic fifth toe would require amputation. However, the paramount question that needs to be addressed to determine whether Dr. Wiley was deliberately indifferent to Redmond's medical needs by intentionally delaying Redmond's amputation is not whether amputation was needed, but when was it medically required to amputate. Redmond conflates these two distinct questions without any medical evidence to support his argument of delay. The decision of when to amputate Mr. Redmond's fifth toe is a complex medical decision that simply is not within the knowledge of lay persons and requires a medical judgment of balancing risks and benefits of infection and amputation. Professor Harara in the court has mentioned many times how the records make reference to the fact that the fifth toe needs to be amputated. The reason why you don't amputate that toe early in May and April is because he still has an infection surrounding that diabetic foot ulcer skin and surrounding tissue. If you amputate Redmond's necrotic fifth toe while he has a diabetic... Counsel, excuse me, Judge Loken, give me a record site for that assertion. Give me where in the summary judgment record there is evidence supporting your assertion about why you don't amputate in April and May. Again, at the district court level, this particular argument of delay in amputation was not forwarded by Mr. Redmond, so there's nothing... That's fine, but you can't go outside the record and make all kinds of medical assertions that we have no basis to unless there's record support for them. Yes, so within the record itself, specifically on April 7th through 10th in the medical record and in the joint appendix, there are medical records that demonstrate that Mr. Redmond was admitted to the hospital for treatment of his necrotic providers from infectious disease, orthopedic surgery, internal medicine... Wait, Counsel, you're not... Counsel, you're not answering my question. I said where in the record is there support for the specific assertion you made? So... That toe amputation in April and May was not appropriate because it was still infected. It's not a question of amputation being inappropriate. It's a question of when is amputation... Why don't you just answer the question and say there is no such evidence and then go on with your argument or give me a record site. So in those records, those specialties say that the plan is to treat Mr. Redmond's cellulitis and then eventually amputate the toe. What that means is we need to wait for that infection to heal and the reason why... Wait a minute. Wait a minute. What that means to whom? To a physician. Well, where's a physician testimony? That doesn't mean that to me. I understand. So the closest I think that you can get to is to look at is within the records the fact that multiple specialties saw him and no one at any point in time says this toe needs to be amputated right now. Instead, what you see in the records repeatedly is attempts to treat his underlying infection surrounding the toe. If you do not treat that infection and amputate without treating it, you cannot tell the difference between healthy viable tissue and unhealthy viable tissue. So that is why instead of amputating in early April and May, you treat with antibiotics and the total contact cast in an attempt to resolve the infection that's occurring around the toe so that when you amputate it is more amenable to amputation and you have a better chance of healing. Nobody spells that out specifically in the records, your honor, but that's what's going on. How can we take it as gospel? Well, I think the closest... That's the kind of thing that you have trials for. Yeah, I think the closest you can get and we didn't get to that stage. Obviously, there were no depositions taken at the district court stage. There was no expert evidence forwarded by plaintiffs. So we never got to the point where, in essence, defense would be submitting its medical experts. The closest that we were able to get is in the district court area, Dr. Wiley provided an affidavit that indicates from his own medical judgment. Right, it's sounding to me like qualified immunity was prematurely granted. I don't believe that that's where the district court ultimately decided the case. The way that I read the district court's ruling is that, at least as far as Dr. Wiley was concerned, that they held that Dr. Wiley provided appropriate and timely diagnosis and treatment in consultation with various specialties. And in so doing, the district court noted that Mr. Redmond submitted no medical evidence that Dr. Wiley's treatment caused Redmond any harm, let alone unnecessary and wanton infliction of pain. Very good. Mr. Haraway, you're out of time. I have one question for you, for which will be effectively rebuttal. And that is, how did you fairly preserve for the appeal, the delay issue that's the focus of your briefing and argument? Yes, Your Honor, if I can point to two record sites to answer your question. So the first is JA 829, which is a plaintiff's opposition to summary judgment, where it states, the plaintiff's claims that defendant violated his Eighth Amendment rights as they were deliberately indifferent to plaintiff's serious medical needs and safety regarding the medical treatment in 2017, which refers to the entire course of treatment. And then I would point to the district court's opinion on JA 876, where the district court focused on the delay. And the district court says, and I quote... Give me that site. I didn't hear the JA wit. 876, Your Honor. Yes. Okay. And the district court says explicitly, Redmond alleges that Dr. Wiley was deliberately indifferent to his serious medical needs by this treatment of Redmond's diabetic ulcers. However, Redmond has an obligation to bring forth verifying medical evidence that a delay in treatment caused him harm. So the district court clearly focused on this delay in its opinion. Now, and I'll look at what you cited, but what I heard you read, I did not hear the word delay in what you just read. So, Your Honor, the district court... Where at any time did this delay argument get asserted to the district court? So, Your Honor, in the actual standards of deliberate indifference that is raised in the summary judgment opposition, it does focus on delay of treatment is deliberate indifference. And then in the kind of argument section says the treatment of care during 2017 was deliberately indifferent. So I admit that they didn't say expressly delay in that paragraph, but it's in the standards. They say the entire course of treatment was deliberately indifferent. And based on the district court's understanding of the pleadings, the district court was also clearly focused on the delay. Thank you. Thank you, Your Honor. Thank you, counsel. The case has been thoroughly briefed and argued, and we will take it under advisement.